UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DAISY K. HARRISON                                                    Plaintiff

v.                                                    Civil Action No. 3:21-cv-174-RGJ

JASON ELLISON, et al.                                              Defendants

* * * * *

## MEMORANDUM OPINION & ORDER

Defendant Jason Ellison ("Ellison") moved for summary judgment.   [DE 49-1]. Defendants City of Shepherdsville ("City") and Mayor Curtis Hockenbury ("Hockenbury," together with the City and Ellison, "Defendants") moved for summary judgment separate and apart from Ellison.  [DE 51-1].  Plaintiff Daisy K. Harrison ("Harrison") responded to both motions [DE 49-1; DE 51-1] and Defendants replied [DE 70; DE 71].   Harrison moved for partial summary judgment.   [DE 53].   Defendants jointly responded [DE 63] and Harrison replied [DE 73].   In addition, Defendants moved to exclude testimony from Harrison's expert, Gregory Gilbertson ("Gilbertson").[1]  [DE 52].  Harrison responded [DE 74] and Defendants replied [DE 74].  Harrison moved to exclude Defendants' expert John E. Combs ("Combs").  [DE 54].  Defendants responded [DE 64] and Harrison replied [DE 72].

Briefing is complete, and the matter is ripe.  For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Exclude Gilbertson [DE 52], **GRANTS IN PART** and **DENIES IN PART** Harrison's Motion to Exclude Combs [DE 54], **GRANTS IN PART** and **DENIES IN PART** Ellison's Motion for Summary Judgment [DE 49-1], **GRANTS**

---

[1] Defendants filed a corrected motion, so the Court will only consider briefing related to the corrected motion to exclude Gilbertson.

1

**IN PART** and **DENIES IN PART** the City's and Hockenbury's Motion for Summary Judgment [DE 51-1], and **DENIES** Harrison's Motion for Partial Summary Judgment [DE 53].

## I.   **BACKGROUND**

On the afternoon of September 24, 2020, Harrison and her boyfriend Zach Finn ("Finn") went to a Feeders Supply in Shepherdsville, Kentucky. [DE 53 at 591]. The couple left their dog in the car while shopping. [*Id.*]. What occurred in the Feeders Supply is disputed, but store manager, Jennifer Wentworth ("Wentworth"), testified that the couple shopped for approximately six minutes. [*Id.* at 59–92]. According to Wentworth, she observed Harrison and Finn in person and via surveillance video. [DE 49-1 at 452]. Wentworth alleges that Harrison appeared to be intoxicated and slurring her words. [*Id.*]. Wentworth believed that Harrison and Finn were attempting to avoid employees and leave the store without paying for merchandise. [*Id.*]. As Harrison and Finn approached the front of the store, Wentworth asked them to leave because they were not wearing masks.[2] [*Id.* at 453]. The couple handed Wentworth the merchandise they were carrying and left the store. [*Id.*]. Wentworth also testified that Harrison insulted her as she exited. [*Id.*; DE 53 at 592].

Before visiting the Feeders Supply, Harrison and Finn had both received treatment at 7:30 a.m. from Crossroads Methadone Clinic in Jeffersontown, Kentucky. [DE 53 at 591]. Harrison and Finn were both recovering from opioid addiction and receiving Methadone therapy. [*Id.*]. Harrison's daily dose had been tapered down from 115 mg per day to 41 mg per day on the morning of September 24th. [*Id.*]. The couple had driven home at approximately 8:00 a.m. [*Id.*].

---

[2] Feeders Supply was enforcing a COVID-19 mask policy during September 2020. [*Id.*].

Despite Wentworth's testimony, Harrison and Finn did not shoplift any merchandise.[3]  [*Id.* at 592].  They were openly carrying items toward the check-out area when Wentworth confronted them about the mask policy.   [*Id.*].   Harrison and Finn were admittedly upset about being confronted because they alleged that the policy was being ignored for other patrons.   [*Id.*].  Harrison and Finn were not allowed to purchase the items they were carrying and left the store.  [*Id.*].

After leaving the Feeders Supply, Harrison realized that Finn had locked his keys in his car where the couple had also left their dog.  [*Id.*].  They attempted to find a way into the car but were unsuccessful.  [*Id.*].  The couple walked to a nearby Cato's clothing store to ask for a wire hanger so they could try to unlock their car door.  [*Id.*].  An employee from Cato's told police that Harrison had asked if the store had extra masks while Finn asked for a hanger.  [*Id.*].  While Finn was still in Cato's Harrison walked out of the store to call her mother in hopes that she knew someone who could unlock the car.  [*Id.*].

Before the couple walked to Cato's, a customer at Feeders Supply saw them trying to gain access to their car.  [*Id.*].  The customer reported the incident to employees at Feeders Supply, and Wentworth called 911.  [DE 49-1 at 453].  During the call, Wentworth stated that there was no emergency, but she had stopped a couple from shoplifting and recovered the merchandise.  [DE 53-2, 911 Audio Recording, 0:00–0:16].  She stated that "the girl is so high she can't even stand up, and now they are trying to pry open a car window."[4]   [*Id.* at 0:18–0:24].  As the dispatcher asked for the address, Wentworth also stated that she was not sure if the car was theirs.  [*Id.* at 0:24–0:27].

---

[3] After further review of the surveillance video, Wentworth confirmed that none of the video showed Harrison or Finn stealing from Feeders Supply.  [DE 47-4, Wentworth Dep. at 414].

[4] Wentworth later conceded that she never witnesses Harrison fall or stumble.  [DE 47-4 at 419–20].

Ellison was the officer dispatched to the Feeders Supply on September 24, in response to Wentworth's 911 call. [DE 49-1 at 450]. Ellison had received Harrison's and Finn's descriptions prior to arriving that the Feeder Supply. [*Id.*]. Ellison first spoke to Wentworth, who advised him that the couple had entered Cato's. [*Id.*]. Ellison returned to his police cruiser and turned it around as he observed Harrison exiting Cato's. [*Id.*]. Ellison concedes that he was not wearing his bodycam during the incident, which was in violation of department policy. [*Id.* at 452].

The characterization of the events that followed are contested by the parties. [DE 49-1; DE 51-1; DE 53]. Ellison testified that as Harrison was walking by, he stated that he needed to speak with her. [DE 49-1 at 451]. She responded, "I have a mask." [*Id.*]. Ellison was confused by this statement and testified that he responded, "No, you need to stop. I need to speak with you." [*Id.* (citing DE 47-1, Ellison Dep. at 222)].[5]  Wentworth also testified that Ellison commanded Harrison to "stop." [DE 47-4 at 428]. Ellison then stated that Harrison again responded that she had a mask and continued to walk past his vehicle. [DE 47-1 at 222]. Harrison testified that she could not recall what Ellison said the first time, only that it could have been "excuse me." [DE 47-2, Harrison Dep. at 329]. She did not recall Ellison stating that he needed to speak with her. [*Id.*]. Harrison did testify that she stated she had a mask. [*Id.*]. At the time, Harrison was concerned about getting her dog out of the car and believed Ellison could be telling her to put on a mask due to the COVID-19 pandemic. [*Id.*]. She did not believe Ellison was there to investigate her and Finn. [*Id.*]. Harrison testified that Ellison did not give her a command to stop after the first exchange of words. [*Id.* at 337]. Instead, Harrison testified that Ellison said nothing else to her before grabbing her arm. [*Id.*].

---

[5] Ellison's deposition testimony was inconsistent regarding whether he told Harrison to stop before grabbing her arm. [DE 47-1 at 222].

4

At this point, Ellison grabbed her left bicep from behind and alleges he told her to stop. [DE 47-1 at 222]. Harrison jerked away, so Ellison used his left had to maintain control of Harrison's left arm. [*Id.*]. Ellison contends that Harrison started "actively resisting" and "making aggressive movements" to keep him from detaining her. [*Id.* at 223, 225–26]. Ellison testified that he took Harrison's left arm, put it behind her back, and pushed it up against her body. [*Id.* at 223–26]. He then pushed her up against his vehicle. [*Id.* at 223]. Ellison stated that Harrison kept trying to put her hand in her pocket. [DE 49-1 at 452]. During the struggle, Ellison heard Harrison's left arm pop and Harrison started to complain of pain. [*Id.*]. Ellison placed a handcuff on Harrison's right hand and told her to sit on the ground. [*Id.*]. Paula Beuchamp ("Beuchamp"), the Feeder Supply cashier, testified that Ellison told Harrison to "stop" more than once while he was attempting to handcuff her. [DE 47-3, Beuchamp Dep. at 396–97].

The interaction between Harrison and Ellison was captured on the Feeder Supply surveillance video. [DE 53-3, Surveillance Video]. The surveillance video does not have sound and the view is obstructed by the door frame and passing vehicles. [*Id.*]. The video shows Ellison stepping out of his cruiser and speaking to Harrison as she walks by. [*Id.* at 13:35:36]. The video shows Harrison talking on the phone with the hand closest to Ellison.[6] [*Id.* at 13:35:42]. As she walks away, the video shows Ellison grabbing her arm from behind while still talking on her phone. [*Id.* at 13:35:48]. Harrison testified that her arm broke at this point when Ellison forced it behind her back. [DE 47-2 at 336–37]. Approximately 12 seconds elapsed between Ellison stepping out of his vehicle and initiating physical contact with Harrison. [DE 53-3, Surveillance Video at 13:35:36–48]. For the next 20 seconds, Ellison can be seen struggling with Harrison until he maneuvers her against his vehicle. [*Id.* at 13:36:09]. Ellison testified that he broke Harrison's arm

---

[6] Ellison testified that he did not recall whether Harrison was on the phone when he spoke to her. [DE 47-1 at 222].

during at this point in the interaction. [DE 47-1 at 237]. Next, Finn can be seen quickly walking towards Harrison and Ellison to see what happened. [DE 53-3, Surveillance Video at 13:36:09]. However, Finn does not appear to interfere. [*Id.* at 13:36:09–16].

Officers from the Shepherdsville Police Department arrived on the scene seconds after the initial encounter between Harrison and Ellison. [DE 53 at 600]. These officers were wearing bodycams, but they do not capture Ellison breaking Harrison's arm. [*Id.*]. Audio from the bodycams captures a chaotic scene following the incident. [DE 53-1, Bodycam Audio]. The audio largely consists of Harrison's cries of pain and a confused interaction between Finn and law enforcement regarding what transpired. [*Id.*]. Officers, including Ellison, can be heard shouting profanities at Harrison and Finn and refusing to explain what they were there to investigate. [*Id.*]. The incident left Harrison with a fractured humerus, which required surgical repair that included rods and pins.[7] [DE 54 at 619–20]. Harrison contends that she was left with permanent injuries from her interaction with Ellison. [*Id.*]

Following the incident Harrison was charged with public intoxication and resisting arrest in violation of KRS 525.100 and KRS 520.090 respectively. [DE 49-1 at 456]. The charges were dismissed without a stipulation of probable cause on January 15, 2022. [DE 49-5]. There is no evidence that Ellison attempted to prove that Harrison was intoxicated. [DE 53 at 601].

Sargent Brandon Beatty ("Beatty") of the Shepherdsville Police Department conducted an investigation following the incident. [DE 65 at 884]. The investigation was documented in the Response to Resistance Report ("Report"). [DE 65-1 at 894]. When preparing his report, Harrison alleges that Beatty failed to (1) secure video footage from Feeders Supply confirming she was not intoxicated, (2) take Ellison's recorded statement, (3) speak with Harrison or Finn, (4) speak with

---

[7] Photographs of Harrison's arm before and after the surgery are included in DE 54 at 620.

the emergency room doctor who noted significant rotational force was applied to her arm, (5) speak with Harrison's mother who was on the phone with Harrison during the incident, and (6) attempt to reconcile inconsistencies between statements made by Ellison and others.  [DE 65 at 885].  Harrison's assertions are supported by certain inconsistencies between the Report and the Surveillance Video.  For example, Beatty writes that while Ellison was attempting to arrest Harrison, Finn attempted "to assist Harrison in fleeing from Officer Ellison however was stopped by the store manager, Jennifer Wentworth."  [DE 65-1 at 897].  At no point does the Surveillance Video depict Finn attempting to help Harrison escape.  [DE 53-3].  The video also does not show Wentworth attempting to restrain Finn or otherwise stop him from assisting Harrison.  [*Id.*].

Shepherdsville Police Chief Rick McCubbin ("McCubbin") accepted and signed off on the Report.  [DE 65-1 at 900].  McCubbin testified that he did not recall watching the Surveillance Video or the bodycam footage before signing off on the Report.  [DE 65 at 886].  McCubbin acknowledged that department policy requires an officer to get a statement from the suspect regarding the use of force but conceded that no officer sought Harrison's statement for the Report.  [*Id.* at 886–87].  Harrison alleges that no officer was ever disciplined because of the arrest or the Report.  [*Id.* at 888].

As a result of the incident on September 24, 2020, Harrison asserted 10 claims against Defendants: (Count I) unlawful seizure, confinement, and arrest, 42 U.S.C. § 1983 against Ellison and the City; (Count II) excessive force, 42 U.S.C. § 1983 against Ellison and the City; (Count III) inadequate training and/or supervision, 42 U.S.C. § 1983 against the City and Hockenbury; (Count IV) deliberate indifference towards Harrison's injury, 42 U.S.C. § 1983 against Ellison and the City; (Count V) assault and battery against Ellison and the City; (Count VI) false arrest and/or imprisonment against Ellison and the City; (Count VII) negligence, gross negligence, and

negligence per se against Ellison and the City; (Count VIII) negligent training and supervision against the City and Hockenbury; (Count IX) excessive force and violation of KRS 431.025 against Ellison and the City.  [DE 1].  In the Amended Complaint Harrison asserted one count (Count X) of malicious prosecution under state and federal law against Ellison and the City.  [DE 22].

Ellison moved for summary judgment [49-1] and the City and Hockenbury separately moved for summary judgment [51-1].  Harrison moved for partial summary judgment.  [DE 53]. To support their claims and defenses, Plaintiffs disclosed Gilbertson [DE 52-1] and Defendants disclosed Combs [DE 54-6] as expert witnesses.  Because the expert reports apply to the parties' summary judgment motions, the Court will first resolve the motions to exclude these experts and then consider all three competing motions for summary judgment.

## II.   MOTIONS TO EXCLUDE

Defendants moved to exclude Gilbertson's three opinions outlined in his report.  [DE 52]. Similarly, Harrison moved to exclude certain opinions from Combs' expert report that she contends are inadmissible.  [DE 54].

### A.  Standard

The admissibility of expert testimony is set forth in Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir.2002) (alteration and internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, 'a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements.  First, the witness must be qualified by knowledge, skill, experience, training, or education.  Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue.  Third, the testimony must be reliable.

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise.  *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at * 33 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").  "Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'" *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013) (quoting *Daubert*, 509 U.S. at 597). To assist with this

determination, the Supreme Court in *Daubert* laid out factors[8] for the courts to consider. *Daubert*, 509 U.S. at 592–94. Courts have "stressed, however, that *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding that the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (internal citations omitted). "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co.*, 526 U.S. at 139.

### B. Defendants' Corrected and Supplemental *Daubert* Motion Regarding the Expert Opinions of Gilbertson [DE 52]

Defendants moved to preclude Gilbertson from testify regarding three opinions offered in his expert report:

1. Ellison's use of force against Harrison;

2. Whether Ellison had probable cause to arrest Harrison for public intoxication; and

3. Whether Shepherdsville Police Department Chief Ronald McCubbin and/or his designated command and supervisory officers engaged in a pattern, practice, and custom of negligent supervision of Ellison.

---

[8] The *Daubert* factors include "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (quoting *Daubert*, 509 U.S. at 592–94).

[DE 52 at 1019–20].   Alternatively, Defendants request a *Daubert* hearing to determine the admissibility of Gilbertson's testimony.  [*Id.* at 1019].   Defendants contend that Gilbertson is not qualified to offer opinions regarding the use of force.  [*Id.* at 1022].   They also contend that his opinions are prohibited legal conclusions.  [*Id.* at 1023–26].   In response, Harrison contends that Gilbertson is imminently qualified, and his opinions are more than bare legal conclusions.  [DE 74].  The Court, seeing no need for a hearing, will address each argument below.

### 1.   Gilbertson's Qualifications

Defendants first contend that Gilbertson is not qualified to testify regarding the use of force. [DE 52 at 1022].  Despite acknowledging that Gilbertson spent eight years as a law enforcement officer, they allege he is unqualified because he has not served as a police officer since 1996.  [*Id.*]. They argue that Gilbertson does not have recent specialized training and has never been a use of force instructor.  [*Id.*].  To qualify as an expert, Gilbertson must demonstrate qualifications that provide a foundation for him to answer specific question on the relevant subject matter.  *See Berry*, 25 F.3d at 1351.  It is the Court's responsibility to determine whether a witness qualifies as an expert.  *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at * 33.  The Court must determine whether Gilbertson's expert knowledge will assist the trier of fact.  *See Mannino*, 650 F.2d at 851.

Gilbertson's CV indicates that he had a distinguished career in the United States Army and as a law enforcement officer for more than a decade.  [DE 52-2 at 530].  He holds an advanced degree in justice administration and has taught criminal justice for approximately 22 years.  [*Id.* at 529].  He has also worked as an international police advisor in Afghanistan and Iraq, a security officer, and an expert witness/private investigator.  [*Id.* at 530].  Gilbertson has also received specialized training in various forms of law enforcement from the Atlanta Police Academy, the Georgia Public Safety Training Center, the U.S. Army Military Police School, and Columbus

College.  [*Id.* at 529].  Based on Gilbertson's extensive experience and training, the Court finds that Gilbertson's opinion would assist the trier of fact when evaluating the use of force.  *See Mannino*, 650 F.2d at 851.  Accordingly, Gilbertson is properly qualified as an expert witness.  *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at * 33.

### 2.  Gilbertson's Opinions About Excessive Force and Probable Cause

Defendants moved to exclude Gilbertson's opinions on Ellison's use of excessive force and whether Ellison had probable cause to arrest Harrison for public intoxication because they are legal conclusions.  [DE 52 at 1023].  Harrison agrees that Gilbertson is prohibited from offering legal conclusions but contends that prohibiting his entire opinion and analysis is much too broad. [DE 74 at 1086].

Federal Rule of Evidence 702 "prohibits expert witnesses from testifying to legal conclusions." *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016).  The Sixth Circuit has held that an expert is offering a legal conclusion "when he defines the governing legal standard or applies the standard to the facts of the case." *Id.* (citing *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985)).  Courts have extensive, but not unlimited, discretion to admit or exclude testimony that arguably contains legal conclusions.  *See Torres*, 758 F.2d at 150 (citing *Stoler v. Penn Cent. Transp. Co.*, 583 F.2d 896, 899 (6th Cir. 1978)).  To determine whether a witness is articulating a legal conclusion, the Court must look at the terms used in the witness's testimony and decide whether they have a "separate, distinct and specialized meaning in the law different from that present in the vernacular." *Id.*  If they do, then the Court must exclude the testimony. *Id.* (citing *United States v. Hearst*, 563 F.2d 1331, 1351 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000 (1978)).

Courts in the Sixth Circuit have also held that police officers may offer "expert testimony regarding recognized police policies and procedure . . . provided that the experts do not express

12

legal conclusions based on their interpretation of the application of those policies in a particular case." *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 690 (E.D. Mich. 2011); *see also Gough v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:12-CV-849- DJH-CHL, 2016 WL 4535663, at *2 (W.D. Ky. Aug. 30, 2016) (finding that the police expert "may, however, testify regarding use-of-force policies and procedures and whether [the officer]'s actions were consistent with those standards.").

Gilbertson's opinion on excessive force does not simply state that Ellison used excessive force as Defendants imply.  [DE 52 at 1024].  Instead, Gilbertson first analyzes Ellison's background, training, and physical fitness.  [DE 52-1 at 522].  He also analyzes Harrison's characteristics and actions as indicated in the Feeder Supply surveillance video.  [*Id.* at 522–23]. Gilbertson indicates that Ellison did not express a clear understanding of how courts evaluate excessive force or how the Shepherdsville Police Department Response to Resistance Policy recommends using force.  [*Id.* at 523].  Gilbertson opines that Ellison failed to comply with the Response to Resistance Policy and recommends alternative force that could have been used under the circumstances.  [*Id.*].

Similarly, Gilbertson's opinion on probable cause analyzes KRS 525.100, the Kentucky statute on public intoxication, and evaluates Harrison's demeanor under that framework.  [*Id.* at 524].  He determines from the surveillance video that Harrison does not exhibit signs of public intoxication.  [*Id.*].  He also revied the Shepherdsville Police Department Policy # 4200, Stop, Arrest, and Search of Persons, and how this internal policy defines probable cause.  [*Id.*]. Gilbertson also reviewed relevant manuals and treatises in his evaluation of the facts.  [*Id.* at 525]. Based on his review of the evidence Gilbertson determined that Ellison violated department policies and common standards for arrests.  [*Id.*].

Gilbertson's opinions on excessive force and probable cause evaluate whether Ellison complied with department procedures. Gilbertson may testify regarding those policies and whether Ellison's actions violated those policies. *See Alvarado*, 809 F. Supp. 2d at 690. Gilbertson analyzes excessive force and probable cause within the context of the relevant department policies, manuals, his experience, and the applicable legal standards. [DE 52-1]. To the extent that Gilbertson determines Ellison used excessive force and did not have probable cause under the legal standard, he is expressing a legal conclusion. *Melcher*, 672 F. App'x at 552. Harrison concedes that Gilbertson should be prohibited from testifying in this way. [DE 74 at 1093]. Accordingly, Gilbertson is prohibited from defining the applicable legal standard for excessive force or probable cause and whether Ellison violated those standards. *See Torres*, 758 F.2d at 150–51.

### 3. *Gilbertson's Opinion Regarding Negligent Supervision*

Defendants contend that Gilbertson's opinion regarding the Shepherdsville Police Department's negligent supervision of Ellison should be excluded because (1) it is couched in legal conclusions, (2) Gilbertson is not qualified to offer the opinion, and (3) it is irrelevant. [DE 52 at 1025]. In response, Harrison contends that Defendants' arguments overly generalize Gilbertson's opinions. [DE 74 at 1094]. Harrison also argues that Gilbertson's opinion is relevant under the caselaw. [*Id.*].

Gilbertson's testimony relates to Ellison's failure to comply with department policies by failing to wear a bodycam and the Shepherdsville Police Departments response to this violation. [DE 52-1 at 525–26]. His opinion also discusses various department policies related to bias in policing that were not enforced against Ellison. [*Id.*].

First, Gilbertson's opinion on this issue does not cite any caselaw or attempt to apply a legal standard to the facts of the case. [*Id.*]. Defendants also fail to explain how Gilbertson's opinion constitutes an impermissible legal conclusion. [DE 52]. Accordingly, the Court finds that

14

Gilbertson's opinion on negligent supervision does not constitute a legal conclusion. *See Torres*, 758 F.2d at 150–51. Next, the Court extensively discussed Gilbertson's qualifications in Section II.B.1. The Court finds that Gilbertson's extensive career in law enforcement and criminal justice qualifies him to discuss negligent supervision in the Shepherdsville Police Department. *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at * 33. Finally, the standard for relevance is low. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Gilbertson's opinion will likely make a fact more or less probable as they relate to Harrison's claim for negligent supervision. *See id.* Accordingly, the Court will not exclude Gilbertson's opinions regarding negligent supervision. Defendants' Motion to Exclude Gilbertson [DE 52] is **GRANTED IN PART** and **DENIED IN PART** as discussed above.

### C. Motion to Exclude Testimony of Combs [DE 54]

Defendants' expert, Combs, provided the following summary of the opinion he intends to offer at trial regarding Ellison's arrest of Harrison:

> Based on the materials I have reviewed, and my education, training, knowledge, and experience in law enforcement, particularly the use of control and restraint techniques in law enforcement, I can opine within a reasonable degree of professional certainty:

> The detention and subsequent arrest along with the amount and method of force used to detain and control Plaintiff Daisy Harrison on September 24, 2020, by Shepherdsville Police Office Jason Ellison were reasonable under the circumstances, and not excessive, unlawful, or otherwise in violation of standard law enforcement practice or established training standards.

Harrison moved to exclude Combs' entire opinion because it was not adequately disclosed and because it constitutes impermissible legal conclusions. [DE 54]. In response, Defendants contend that Combs' opinion was properly disclosed under Rule 26. [DE 64 at 872]. They also ague that Combs' testimony does not constitute legal conclusions. [*Id.* at 873–78].

15

### 1. Disclosure of Combs' Opinion

Harrison contends that the summary opinion provided by Combs is the only opinion he is allowed to testify to because it was the only opinion properly disclosed in the expert report. [DE 54 at 632–33]. Defendants contend that Combs' expert report complies with Rule 26. [DE 64 at 872]. Pursuant to Rule 26, an expert report must contain "a complete statement of all opinions [he] will express and the basis and reasons for them." Fed. R. Civ. P. 26(2)(B)(i). Combs provided a written report that included a summary of his opinions, the factual basis, and an analysis. [DE 54-6]. Harrison cited no caselaw that would prohibit an expert from testifying to specific opinions simply because he testified that the summary opinion was his only opinion. [DE 54]. Harrison did not argue that Combs' report violated any other part of Rule 26. [*Id.*]. Accordingly, the Court finds that Combs' report complied with Rule 26.

### 2. Combs' Opinion and Legal Conclusions

Harrison contends that Combs' opinion, in its entirety, consists of a series of legal conclusions. [DE 54 at 636]. In response, Defendants represent that they will not elicit testimony from Combs on the "reasonableness" of Ellison's arrest that would constitute a legal conclusion. [DE 64 at 874–75]. Defendants also contend that Combs' opinions on discrete police practices are admissible. [*Id.* at 875].

As the Court previously explained, Rule 702 "prohibits expert witnesses from testifying to legal conclusions." *Melcher*, 672 F. App'x at 552. Experts are prohibited from defining the governing legal standards or applying them to the case. *Id.* (citing *Torres*, 758 F.2d at 150–51). However, experts are not prohibited from testifying regarding police policies and procedures so long as the testimony does not become a legal conclusion. *See Alvarado*, 809 F. Supp. 2d at 690.

The district courts have extensive discretion to admit or exclude testimony that arguably contains legal conclusions. *See Torres*, 758 F.2d at 150.

Cox's opinion discusses the reasonableness of Harrison's arrest, including the existence of probable cause and reasonable suspicion. [DE 54-6]. He also discusses the applicable legal standards and their interpretations as applied to the facts of this case. [*Id.* at 655–56]. Cox is prohibited from testifying regarding the applicable legal standards and applying them to Harrison's arrest or Ellison's use of force. *See Melcher*, 672 F. App'x at 552. The Sixth Circuit prohibits Cox's testimony in this instance where the terms he uses have distinct, specialized meanings that have been defined in the caselaw. *See Torres*, 758 F.2d at 150. Cox also provides opinions on police procedures and training. [DE 54-6]. He provides opinions on topics from de-escalation and use of force to hiring, training, and supervision. [*Id.* at 658–60]. There is no indication that Cox is using these opinions to define a legal standard. *See Melcher*, 672 F. App'x at 552. Accordingly, Cox is precluded from testifying regarding legal conclusions, but will not be prohibited from testifying regarding police procedures and training. Harrison's Motion to Exclude Cox [DE 54] is **GRANTED IN PART** and **DENIED IN PART** as discussed above.

### III.   STANDARDS

#### A.  Summary Judgment

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Factual differences

17

are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion. *Id.* at 252.

The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

**B.  Qualified Immunity**

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). When

advanced by a defendant, qualified immunity is a threshold question of law appropriately determined on a motion for summary judgment.  *Harlow v. Fitzgerald*, 457 U.S. 800 (1983).  "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The plaintiff bears the ultimate burden of proof in establishing that a defendant has no right to qualified immunity.  *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).  That said, in moving for summary judgment based on qualified immunity, a defendant must first show "facts to suggest that he acted within the scope of his discretionary authority during the incident in question."  *Id.*  The burden then shifts to the plaintiff to show "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct."  *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).  If "undisputed facts show that the defendant's conduct did indeed violate clearly established rights[,]" or "if there is a factual dispute . . . involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights[,]" a court must deny summary judgment.  *Gardenhire*, 205 F.3d at 311 (quoting *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988) (citations omitted)).

The Supreme Court requires a two-pronged approach when resolving questions of qualified immunity, although courts may decide the order in which to address these prongs "in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.  First, the Court must decide whether a plaintiff has presented facts sufficient to find a violation of a constitutional right.

*Id.* at 232. The Court views this evidence in the light most favorable to the plaintiff. *See Shreve*, 743 F.3d at 134. Second, the Court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Thus, qualified immunity applies unless the official's conduct violates a clearly established constitutional right. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). If the court finds that the plaintiff's right was not clearly established, the Court can start with the second factor and does not "need to determine whether the alleged conduct was in fact unconstitutional." *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) (citing *Pearson*, 555 U.S. at 236–43)).

## IV.  **HOCKENBURY**

As a threshold matter, Hockenbury moved to be dismissed because Harrison's claims against him are duplicative of her claims against the City. [DE 51-1 at 496]. Harrison concedes that her claims against Hockenbury are duplicative of her claims against the City. [DE 65 at 880]. She also clarifies that she is not making individual-capacity claims against Hockenbury. [*Id.*].

"Suits against municipal employees in their official capacities 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Scott v. Louisville/Jefferson Cnty. Metro Gov't*, 503 F. Supp. 3d 532 (W.D. Ky. 2020) (*Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. When this situation occurs, judges "[i]n the Eastern and Western Districts of Kentucky . . . have adopted the practical approach of dismissing the official capacity claims." *Baar v. Jefferson Cnty. Bd. of Educ.*, 686 F. Supp. 2d 699, 704 (W.D. Ky. 2010); *see also, e.g.*, *Thorpe v. Breathitt Cnty. Bd. of Educ.*, 932 F. Supp. 2d 799, 802 (E.D. Ky. 2013) ("[W]hen a § 1983 complaint asserts a claim against a municipal entity and a municipal official in

his or her official capacity, federal courts will dismiss the official-capacity claim."); *Owens v. Trulock*, No. 1:18-CV-00167, 2020 WL 376658, at *2, (W.D. Ky. Jan. 23, 2020) (dismissing official capacity claims as duplicative of Plaintiffs' claims against the City of Horse Cave). The City has not asserted that is did not receive notice or a chance to respond to Harrison. Accordingly, Hockenbury is **DISMISSED** from this case, and the following analysis only applies to the City.[9]

## V.   UNLAWFUL SEIZURE, CONFINEMENT, AND ARREST (COUNT I) AND MALICIOUS PROSECUTION (COUNT X)

In Count I, Harrison alleges that Ellison violated her Fourth Amendment right to be free from unlawful seizure, confinement, and arrest. [DE 1]. Harrison also alleges malicious prosecution under federal law in Count X [DE 22]. Defendants moved for summary judgment on Counts I and X [DE 49-1 at 465; DE 51-1 at 497]. The Court will address Counts I and X together because Defendants have addressed them together in Ellison's motion for summary judgment. [DE 49-1 at 465]. Harrison also moved for partial summary judgment requesting a finding that Ellison did not have probable cause to arrest Harrison. [DE 53 at 602].

Harrison's success on Count I and Count X turns on whether Ellison had probable cause to stop and arrest her. *Howse v. Hodous*, 953 F.3d 402, 408–409 (6th Cir. 2020). "[T]he constitutional tort of malicious prosecution that is actionable in [the Sixth Circuit] as a Fourth Amendment violation under § 1983 does not require a showing of malice at all, and might more aptly be called 'unreasonable prosecutorial seizure.'" *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017) (quoting *Sykes v. Anderson*, 625 F.3d 294, 310 (6th Cir. 2010)). Both claims hinge on an alleged unreasonable seizure that cannot exist if the officer had probable cause. *Howse*, 953

---

[9] Ellison also argued that dismissal of his official capacity claims is warranted under the same theory. [DE 49-1 at 477]. However, this goes beyond the practice employed in the Western District of Kentucky, and Ellison did not cite caselaw indicating otherwise. Accordingly, Harrison's official capacity claims against Ellison will remain.

F.3d at 409.   Accordingly, the Court's discussion of probable cause will apply equally to both Counts.

### A.  Counts I and X: Constitutional Violation

Defendants contend that they are entitled to summary judgment on Counts I and X because they are immune from prosecution under qualified immunity.  [DE 49-1 at 469].  In response, Harrison argues that Ellison is not entitled to qualified immunity.  [DE 66 at 927].

Under the two-pronged qualified immunity analysis, the Court must decide whether a Harrison has presented facts sufficient to find a violation of a constitutional right.  *Pearson*, 555 U.S. at 236.  The Court views this evidence in the light most favorable to the plaintiff.  *See Shreve*, 743 F.3d at 134.  The constitutional right asserted here is the right to be free from seizure absent probable cause under the Fourth Amendment.  [DE 1].  "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (quoting *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)).  "[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011).

Probable cause requires, "at the moment the officer seeks the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'" *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  Viewing the totality of the circumstances, "probable cause exists only when the police officer 'discovers reasonably reliable information that the suspect has

committed a crime.'" *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (quoting *Gardenhire*, 205 F.3d at 318). The arresting officer must take into account inculpatory and exculpatory information known to him when determining whether probable cause exists. *See Barton v. Martin*, 949 F.3d 938, 951 (6th Cir. 2020) (citing *Courtright*, 839 F.3d at 521). For example, "[a] phone call reporting criminal activity, without any corroborating information, does not provide probable cause for an arrest." *Id.* (citing *Courtright*, 839 F.3d at 522).

Here, Ellison had received a 911 call from Wentworth that Harrison was intoxicated, suspected of shoplifting, and attempting to break into a car.[10] [DE 49-1 at 468]. After arriving at Feeder Supply, Ellison verified this information with Wentworth and learned that Harrison had entered the store next door. [*Id.* at 450]. Harrison, matching the description given by Wentworth, exited Cato's and approached his police cruiser. [*Id.*]. Although their initial interaction was brief, Ellison testified that Harrison's pupils were dilated. [DE 47-1 at 224]. He also testified that she was acting evasive as she approached the police cruiser. [*Id.*]. There is no evidence that Ellison observed Harrison stumbling as she approached.

The Sixth Circuit has held that because "eyewitness' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity." *Courtright*, 839 F.3d at 521 (quoting *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)). Neither side disputes that Wentworth personally witnessed Harrison's behavior in Feeder Supply. Therefore, Ellison was entitled to presume that Wentworth's statements about Harrison's potential intoxication and shoplifting were reliable. *See id.* Harrison's statements would have become more credible when Harrison exited Cato's as Wentworth described. *See Ahlers*, 188 F.3d at 370–71 (finding probable cause where eyewitness statements were verified).

---

[10] Arrest under Kentucky's public intoxication statute "is intended to require some aberrant behavior on the part of the accused." *Maloney v. Commonwealth*, 489 S.W.3d 235, 240 (Ky. 2016).

To succeed, Harrison would have to allege facts to suggest that Ellison had reason to believe Wentworth's statements were false at the time of the arrest. *See id.* However, there is no evidence to suggest that Ellison's observations contradicted Wentworth. The Court finds that at the time of the arrest, Ellison had reasonably reliable information that Harrison committed a crime. *See Gardenhire*, 205 F.3d at 318. Because Ellison was able to corroborate parts of Wentworth's statements, Ellison had probable cause to arrest Harrison. *See Ahlers*, 188 F.3d at 370–71; *see also United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005) ("[I]ndependent corroboration of an informant's story is not necessary to a determination of probable cause[.]"). Harrison has failed to satisfy her burden to prove that Defendants are not entitled to qualified immunity on Count I and Count X. The plaintiff bears the ultimate burden of proof in establishing that a defendant has no right to qualified immunity. *See Gardenhire*, 205 F.3d at 311. Ellison's Motion for Summary Judgment [DE 49-1] and the City's Motion for Summary Judgment [DE 51-1] are **GRANTED** as to Count I and Count X. Harrison's Motion for Partial Summary Judgment [DE 53] is **DENIED** regarding probable cause.

## VI.   EXCESSIVE FORCE (COUNT II)

In Count II, Harrison alleges Ellison used excessive force in violation of the Fourth Amendment during the arrest. [DE 1]. Defendants moved for summary judgment on Count II [DE 49-1 at 457; DE 51-1 at 497]. Harrison also moved for partial summary judgment requesting a finding that Harrison was not actively resisting arrest. [DE 53 at 590–91].

### A.  Count II: Constitutional Violation

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Generally, "[t]he Fourth Amendment's

24

prohibition against unreasonable seizures bars excessive force against free citizens . . . while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons," and the Fourteenth Amendment bars excessive force when neither category applies. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citations omitted).

A claim of excessive force in "an arrest, investigatory stop, or other 'seizure'" is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 388. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. The court must pay "careful attention to the facts and circumstances of each particular case," *id.*, and "consider the difficulties of modern police work," *Smith v. Freland*, 954 F.2d 343, 346 (6th Cir. 1992), when evaluating whether an officer acted reasonably during an arrest. A court must consider the totality of the circumstances when evaluating the objective reasonableness of the arrest. *Smith v. City of Troy, Ohio*, 874 F.3d 938, 943 (6th Cir. 2017). Three important, non-exhaustive factors guide this analysis: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (citing *Graham*, 490 U.S. at 396).

### 1. Severity of the Crime at Issue

The first factor—the severity of the crime at issue—weighs in Harrison's favor. The potential crimes at issue were attempted shoplifting and public intoxication. [DE 66 at 913–14]. Both crimes are misdemeanors at the lowest end of the severity scale and neither are considered crimes of violence. [*Id.*]. A reasonable jury could conclude that attempting to shoplift and public intoxication are not "serious" crimes when determining whether an officer used excessive force

25

during an arrest. *See Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) (holding disorderly conduct was not a serious crime).

### 2. *Immediate Threat to Safety*

The Court will next consider whether Harrison posed an immediate threat to the safety of the officers or others. *See Shreve*, 453 F.3d at 687. The Court must consider the stature of the parties involved. *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004). Ellison is physically fit and can be seen towering over Harrison in the Surveillance Video. [DE 53-3, Surveillance Video, at 13:35:40–50]. He was easily able to throw Harrison into his police cruiser and inflict serious injuries. [*Id.*; DE 54 at 620]. Moreover, there is no evidence that Harrison had any weapons or was suspected of having a weapon. The video indicates that Harrison and Ellison were in a public parking lot during the daytime. [DE 53-3, Surveillance Video]. Wentworth did not report that Harrison had acted violently in her 911 call, and there is no additional evidence in the record that would suggest Ellison had a reason to believe Harrison may be violent. Viewing the evidence in the light most favorable to Harrison, the Court finds that this factor weighs in favor of Harrison. *See Shreve*, 743 F.3d at 134. A reasonable juror could not find that Harrison would have posed an immediate threat to Ellison's safety or the safety of others.

### 3. *Resisting Arrest*

Finally, the Court considers whether Harrison actively resisted arrest or attempted to flee. *See id.* The constitutional analysis turns on whether Harrison was actively resisting as opposed to passively resisting or not resisting at all. *See Goodwin*, 781 F.3d at 323 (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). Active resistance can take the form of "verbal hostility" or "a deliberate act of defiance." *Eldridge v. City of Warren*, 533 F. App'x 529, 534–35 (6th Cir. 2013).

The Surveillance Video shows that only 12 seconds elapsed before Ellison decided to use force on Harrison. [DE 52-1 at 520; DE 53-3, Surveillance Video at 13:35:36–48]. Because the Surveillance Video does not have sound and Ellison was not wearing his bodycam, the Court must rely on the parties' testimony for what was said. [DE 53-3, Surveillance Video at 13:35:36–48]. The video shows Ellison stepping out of his vehicle and saying something to Harrison as she walked by on the phone. [*Id.* at 13:35:36–42]. Neither party disputes that Harrison was confused and mentioned that she had a mask in response to Ellison's request to speak. [DE 49-1 at 451]. Next, Ellison grabs Harrison's arm from behind as she continued to walk away. [DE 53-3, Surveillance Video at 13:35:48–56]. Harrison testified that Ellison did not give her a command to stop after their first exchange of words. [47-2 at 337]. She further testified that Ellison said nothing else to her before grabbing her arm. [*Id.*]. The twisting maneuver during Harrison's and Ellison's brief interaction caused Harrison's severe spiral fracture. [DE 52-1 at 520].

Viewing the evidence in the light most favorable to the plaintiff, see *Shreve*, 743 F.3d at 134, the Court cannot conclude that Harrison was resisting arrest. *See Eldridge*, 533 F. App'x at 534–35. Instead, the Surveillance Video and Harrison's testimony could allow a reasonable fact finder to conclude that Harrison was not resisting arrest. The interaction between Harrison and Ellison lasted only seconds and could not have allowed Harrison to comply with Ellison's orders even if a jury were to find any orders were given. Accordingly, the Court finds that the third factor weighs in Harrison's favor.

After reviewing the totality of the circumstances, *Graham*, 490 U.S. at 396, Harrison has satisfied her burden to prove a constitutional violation that would deprive Ellison of qualified immunity. *See Gardenhire*, 205 F.3d at 311. The Court found that all three factors weighed in her favor. *See Goodwin*, 781 F.3d at 322. The Court must assess objective reasonableness, as

"judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See Goodwin*, 781 F.3d at 322.  However, viewing the evidence in the light most favorable to the plaintiff, it is unlikely that Ellison's actions were objectively reasonable.  Because Harrison has presented facts sufficient to allege a violation of the Fourth Amendment, see *Pearson*, 555 U.S. at 232, the Court must now analyze whether Ellison violated a clearly established right.[11]

### B.  Clearly Established Right

Even if an official's behavior violates the Constitution, however, qualified immunity applies unless the official's conduct violates a clearly established right.  *Pearson*, 555 U.S. at 232. The official's conduct violates clearly established right "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear'" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Creighton*, 483 U.S. at 640).  A case directly on point is not required.  *Id*.  Instead, existing precedent must place the constitutional question beyond debate.  *Id*.  "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted).[12]

In examining "existing precedent," the Court looks "first to decisions of the Supreme Court," then to Sixth Circuit cases and "decisions of other courts within the circuit, and then to

---

[11] Because the Surveillance Video does not have audio and because Harrison's and Ellison's provide conflicting accounts of what transpired, there is an issue of fact that the Court cannot resolve.  Therefore, the Court will not go so far as to grant Harrison's Motion for Partial Summary Judgment [DE 53] and find that Harrison did not resist arrest.  This issue must be resolved by the ultimate finder of fact.  *See Liberty Lobby*, 477 U.S. at 252.

[12] The Supreme Court has recognized "that officials can still be on notice that their conduct violates established law even in novel factual circumstances" and has "rejected a requirement that previous cases be 'fundamentally similar'" to the facts in a case to render qualified immunity inapplicable. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 263 (1997)).  As noted, however, the Court has more recently held that plaintiffs must identify existing precedent that places the legal question "beyond debate" to "every" reasonable officer, *al-Kidd*, 563 U.S. at 741, and has since appeared committed to that more-stringent standard.  *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).

decisions of other Courts of Appeal." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although the conduct at issue in those cases need not be identical, the legal precedent "must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion" that the conduct is unlawful. *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012).

In evaluating whether a right is clearly established, courts cannot "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Instead, "[t]he 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Dist. of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018). The officer's conduct must be unlawful not in the abstract but "in the situation he confronted." *Id.* Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is clear enough even though existing precedent does not address similar circumstances. *Id*. (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). Thus, "[w]hether a defendant is protected by qualified immunity turns not on whether the defendant was on notice that his actions satisfied the elements of a particular cause of action, but instead on whether the defendant was on notice that his actions violated the laws of the United States." *Jackson v. City of Cleveland*, 920 F.3d 340, 372 (6th Cir. 2019); *see also Miller v. Maddox*, 866 F.3d 386, 395 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 2622 (2018); *Spurlock*, 167 F.3d at 1005–1006 (finding that a right was clearly established even though that right was previously analyzed under the Fourteenth Amendment but was now properly analyzed under the Fourth Amendment).

The Sixth Circuit has "held that 'the right to be free from physical force when one is not resisting the police is a clearly established right.'" *Goodwin*, 781 F.3d at 328 (quoting *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008)). Moreover, courts in the Sixth Circuit have repeatedly held that the use of additional force on a suspect after he has been neutralized is

unreasonable.  *See, e.g.*, *Baker*, 471 F.3d at 607; *Shreve*, 453 F.3d at 687; *Champion*, 380 F.3d at 902 (citing cases); *see also Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was.").  Citizens who no longer pose a safety risk to officers during an arrest have a right to be free from "gratuitous violence."  *Shreve*, 453 F.3d at 688; *see also McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988).

Pursuant the Sixth Circuit's caselaw, Harrison had a right to be free from force because she likely did not resist arrest.  *See Wysong*, 260 F. App'x at 856.  Harrison had a clearly established right to be free from excessive force when Ellison grabbed her arm, forced it into her back, and slammed her into his police cruiser.  *See Smoak,* 460 F.3d at 784 (law clearly established that tackling subdued suspect would have been unreasonable).  Ellison's maneuver resulted in a severe spiral fracture after grabbing Harrison unexpectedly from behind.[13]  [DE 52-1 at 520].  Because there is significant caselaw supporting Harrison's right to be free from gratuitous force, Ellison violated a clearly established right by twisting Harrison's arm and forcing her into the side of his police cruiser.  *See Baker*, 471 F.3d at 608.  Because a reasonable jury could find that Ellison violated Harrison's clearly established Fourth Amendment right to be free from excessive force, Ellison's Motion for Summary Judgment [DE 49-1] and the City's Motion for Summary Judgment [DE 51-1] are **DENIED** as to Count II.  Harrison's Motion for Partial Summary Judgment [DE 53] is **DENIED** regarding active resistance.

---

[13] The doctor's note from Harrison's emergency room visit indicates that "a rather significant rotational force [was] applied to her arm to create such a fracture."  [DE 53-4 at 616].

## VII.   INADEQUATE TRAINING AND/OR SUPERVISION (COUNT III) AND NEGLIGENT TRAINING AND SUPERVISION (COUNT VIII)

In Count III, Harrison alleges inadequate training and supervision pursuant to federal law against the City.  [DE 1 at 6].  She also alleges, in Count VIII, that Ellison was negligently trained and supervised under state law in.  [*Id.* at 8].  The City contends that Harrison failed to properly plead both claims, which warrants dismissal under Federal Rule of Civil Procedure 12(b)(6).  [DE 51-1 at 498].  In response, Harrison contends that her claims were properly pled and supported by substantial evidence.  [DE 65 at 882].

### A.  Standard for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  "But the district court need not accept a bare assertion of legal conclusions."  *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief."

31

*Southfield Educ. Ass'n v. Southfield Bd. Of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64). Although the City moved to dismiss Counts III and VIII pursuant to Rule 12(b)(6), the parties have submitted significant evidence outside of the pleadings. [DE 49-1; DE 51-1; DE 53]. Therefore, the Court will apply the Rule 56 standard when analyzing the City's motion. *See* Fed. R. Civ. P. 56(d) ("If, on a motion under Rule 12(b)(6) . . ., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").[14]

### B. Count III: Inadequate Training and/or Supervision

To succeed on Count III under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978), a plaintiff must point to a government "policy or custom" and demonstrate that it was "the moving force of the constitutional violation found by the District Court." To prove the existence of a municipality's illegal policy or custom, a plaintiff may point to "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989).

The theory Harrison puts forth in her response to the City's Motion for Summary Judgment is based on the City's ratification of illegal conduct. [DE 65 at 882]. The Sixth Circuit has held that "[a] plaintiff can establish municipal liability by showing that the municipality ratifies the

---

[14] Defendants concede that the Court must apply Rule 56. [DE 70 at 1031 n.1].

unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid, Ohio*, 962 F.3d 852 (6th Cir. 2020). Harrison bases her claim on an analogy to *Wright v. City of Canton*, 138 F. Supp. 2d 955 (N.D. Ohio 2001). In *Wright*, the plaintiff allegedly refused orders from a police officer and suffered severe injuries when arrested. *See* 138 F. Supp. 2d at 958. The incident was reported by the plaintiff's doctor, but the internal affairs investigation exonerated the officers involved. *See id.* at 960. The Northern District of Ohio held that approval of the investigation was tantamount to ratifying the underlying conduct. *See id.* at 967–68.

> In Count III, Harrison's complaint contains the following allegations:
>
> Defendants City and Hockenbury violated Plaintiff's rights under the Fourth and Fourteenth Amendments of the United States Constitution by being deliberately indifferent toward the training and supervision needed for Defendant City's police officers to provide that citizens were not unlawfully seized or detained and subjected to excessive force, and are accordingly liable to Plaintiff pursuant to 42 U.S.C. § 1983.

[DE 1 at 6]. Count III contains no other allegations. [*Id.*]. Harrison states that this paragraph "specifically and succinctly" pleads municipal liability. [DE 65 at 882].

Because the Court is reviewing pursuant to the Rule 56 standard, it must consider additional evidence included in the record. Harrison alleged, that the investigation conducted by Beatty and McCubbin was a sham. [DE 65 at 888] In support of her allegation, she alleges that Beatty and McCubbin failed to adequately investigate Ellison's arrest and included their findings in the Report. [*Id.*]. McCubbin verified that Beatty failed to properly obtain statements for the Report. [*Id.* at 886–87]. Moreover, Harrison points to blatant inconsistencies between the Surveillance Video and the Report. [*Id.* at 885–86]. There is no evidence that Ellison or Beatty were ever disciplined from the arrest or preparation of the Report.

Like *Wright*, a reasonable juror could conclude that McCubbin's approval of the investigation and failure to discipline Ellison meant that McCubbin ratified Ellison's use of force. *See* 138 F. Supp. 2d at 967–68.  Harrison's allegations based on the evidence put forth have stated "a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  Moreover, there is a material dispute of fact regarding McCubbin's ratification of the Report and Ellison's use of force. *See Liberty Lobby*, 477 U.S. at 247–48.  A reasonable jury could find for Harrison based on the facts alleged.  *Id.* at 252.  Therefore, the City's Motion for Summary Judgment [DE 51-1] is **DENIED** as to Count III.[15]

### C.  Count VIII: Negligent Training and Supervision

In Count VIII, Harrison alleges the City breached its duty to train and supervise Ellison in such a manner as to prevent injury.  [DE 1 at 8].  The City moved to dismiss Count VIII because Harrison failed to plead sufficient facts to support her claim.  [DE 51-1 at 503].  In response, Harrison contends that sufficient evidence exists to support her state law claims for negligent training and supervision.  [DE 65 at 889].

To state a claim for negligent training and supervision under Kentucky law, a "plaintiff must allege that the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries."  *Grand Aerie Fraternal Ord. of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005) (quoting 27 Am. Jur. 2d *Employment Relationship* § 401 (2004)).  A plaintiff can prove the first element of a negligent training and supervision claim by demonstrating that the employer should have known the risk presented from poorly trained

---

[15] Neither Harrison nor the City independently addressed the merits of Count IV in their motions.  To The extent the parties meant to argue it as part of Count III, the Court reasserts its ruling.  Therefore, Count IV will be allowed to proceed.

officers.  *See Dempsey v. City of Lawrenceburg*, No. CIV.A. 3:09-33-DCR, 2010 WL 3825473, at

\*7 (E.D. Ky. Sept. 23, 2010) (holding a failure to train officers on the service and interpretation of

emergency protection orders precluded summary judgment).

> In Count VIII, Harrison's complaint contains the following allegations:

> Defendants City and Hockenbury owed duties to Plaintiff and others to train and supervise employees of the City in such a manner as to prevent unnecessary injury.

> Said Defendants breached these duties which were substantial factors in Defendant Ellison causing harm to Plaintiff.

> Said Defendants are liable for all damages caused by their failure to train and supervise Defendant Ellison.

[DE 1 at 8].  Because the Court is reviewing pursuant to the Rule 56 standard, it must consider

additional evidence included in the record.

Harrison asserts that Ellison and other officers violated several internal policies during her

arrest and the following investigation.  [DE 65 at 889].  Ellison concedes that he violated the

department policy by failing to wear his bodycam.  [DE 49-1 at 452].  Two other officers, including

Beatty, also violated the bodycam policy once they arrived on the scene.  [DE 65-1 at 900].  There

is also evidence that Ellison was poorly trained on the use of force.  Ellison testified that he was

unfamiliar with the elements of the crime that led to Harrison's arrest.  [DE 65 at 890].  He also

testified that he was unfamiliar with how to evaluate the degree of force necessary during an arrest.

[DE 47-1 at 217 (testifying that the severity of the crime at issue is irrelevant when evaluating use

of force)].  A reasonable juror could find that Ellison's testimony demonstrates a misunderstanding

of the Shepherdsville Police Department Response to Resistance Policy #5200.  [DE 52-1 at 523].

As explained in *Dempsey*, if the Shepherdsville Police Department did not train its officers

on the use of force or other policies then it should have known the risk this would create.  *See*

*Dempsey*, 2010 WL 3825473, at \*7.  The City knew its officers would arrest suspects and be

required to use a degree of force that complied with the Constitution.  *See id.*  Therefore, it should have known that allowing untrained officers to complete such tasks could cause harm to others. *See id.*  Harrison's allegations based on the evidence put forth have stated "a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  Moreover, there is a material dispute of fact regarding the City's failure to train Ellison and other officers.  *See Liberty Lobby*, 477 U.S. at 247–48.  A reasonable jury could find for Harrison based on the facts alleged.  *Id.* at 252.

### D.  Qualified Official Immunity and CALGA

The City contends that it is immune from prosecution under qualified official immunity and the Claims Against Local Government Act ("CALGA").  [DE 51-1 at 505–506].  In response, Harrison argues that neither theory shields the City from immunity.

In Kentucky, qualified official immunity protects government officials when making decisions involving the exercise of discretion.  *See Yanero v. Davis*, 65 S.W.3d 510 521 (Ky. 2001).  It applies to "the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority."  *Id.* at 522 (citations omitted).  Qualified official immunity does not apply to ministerial functions, such as "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Id.*

Under CALGA, a municipality is immune from liability for "torts committed in the performance of legislative or judicial or quasi-legislative or quasi-judicial functions . . . and can otherwise be held vicariously liable for the torts of its employees."  *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 164 (Ky. 2003) (citations omitted).  However, CALGA neither expands nor contracts the scope of immunity applicable to local governments and its employees.  *See Ashby v. City of*

*Louisville*, 841 S.W.2d 184, 186–87 (Ky. App. 1992) (holding CALGA codified an already judicially recognized exception to the rule of municipal tort liability); *Griffith v. Flinn*, No. 2002-CA-000389-MR, 2003 Ky. App. LEXIS 161, at *6 (Ky. App. June 27, 2003) ("It was not the intent of the drafters of [CALGA] to abrogate or expand the immunity afforded to local governments by either the constitution or the common law."). "Cities . . . are now liable for negligent acts outside the legislative and judicial realms." *Comair, Inc. v. Lexington-Fayette Urb. Cnty. Airport Corp.*, 295 S.W.3d 91, 94–95 (Ky. 2009).

The City claims that it is immune from prosecution because Ellison's training and supervision were discretionary functions. [DE 51-1 at 506]. However, the Sixth Circuit has held "the training of employees to adhere to their duties . . . is a ministerial function." *Finn v. Warren Cnty., Ky.*, 768 F.3d 441, 449 (6th Cir. 2014) (quoting *Hedgepath v. Pelphrey*, 520 F. App'x 385, 391 (6th Cir. 2013)). The Sixth Circuit has also held that "the supervision of employees is a ministerial act when it merely involved enforcing known policies." *Id.* (quoting *Hedgepath*, 520 F. App'x at 391. Therefore, the City's duty to train and supervise Ellison and other officers is considered ministerial, not discretionary. *See id.* Because these functions are ministerial, the City is not protected by qualified official immunity. *See Yanero*, 65 S.W.3d at 522. CALGA neither expands nor contracts the degree of immunity provided to local governments, so the City is not protected by the statute. *See Ashby*, 841 S.W.2d at 186–87. The City has failed to demonstrate that it is protected by qualified official immunity. Therefore, the City's Motion for Summary Judgment [DE 51-1] is **DENIED** as to Count VIII.

## VIII.   ASSAULT AND BATTERY (COUNT V) AND STATE LAW EXCESSIVE FORCE AND STATUTORY VIOLATIONS (COUNT IX)

Harrison alleges assault and battery, in Count V, against Ellison and the City. [DE 1 at 6–7]. In Count IX, she alleges Ellison used excessive force under Kentucky law. [*Id.* at 8]. Ellison

and the City moved for summary judgment on these claims because Ellison did not commit exert more force than necessary to complete Harrison's arrest.  [DE 49-at 476].  The City contends that because the claim against it is derivative, Harrison cannot recover against it on a theory of *respondeat superior*.  [DE 51-1 at 505].  Ellison and the City also contend that they are protected by qualified immunity.  [DE 49-1 at 477].

The Sixth Circuit has held that "[t]he use of excessive force by a police officer constitutes the intentional tort of battery."  *Browning v. Edmonson Cnty., Ky.*, 18 F.4th 516, 531 (6th Cir. 2021) (quoting *Ali v. City of Louisville*, No. 3:03CV-427-R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006)).  Moreover, Kentucky law provides:

(1) The person making an arrest shall inform the person about to be arrested of the intention to arrest him, and of the offense for which he is being arrested.

(2) An arrest is made by placing the person being arrested in restraint, or by his submission to the custody of the person making the arrest. The submission shall be in the actual presence of the arrester.

(3) No unnecessary force or violence shall be used in making an arrest.

KRS § 431.025.  If a jury could find that that Ellison violated a clearly established right, then the Defendants are not protected by qualified immunity.  *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 901 (6th Cir. 2020).

The Court's ruling on Count II precludes summary judgment in favor of Defendants.  The Court held, *supra* Section VI., that a jury could find that Ellison used excessive force.  The Court also held, *supra* Section VI.B., that a jury could find that Ellison violated a clearly established right and used unnecessary force while arresting Harrison.  Therefore, a jury could find a violation of KRS § 431.025 and that Ellison committed assault and battery under state law.  *See Browning*, 18 F.4th at 531.  Because a reasonable jury could find that Ellison violated a clearly established right during the arrest, the Defendants are not protected by qualified immunity.  *See Queen*, 956

F.3d at 901.   Accordingly, Ellison's Motion for Summary Judgment [DE 49-1] and the City's

Motion for Summary Judgment [DE 51-1] are **DENIED** as to Count V and Count IX.

## IX.   FALSE ARREST AND IMPRISONMENT (COUNT VI) AND STATE LAW MALICIOUS PROSECUTION (COUNT X)

In Count VI, Harrison alleges that Ellison and the City falsely arrested and imprisoned her.

[DE 1 at 7].   Harrison alleges, in Count X, that she was maliciously prosecuted in violation of state

law.   [DE 22].   Ellison and the City move for summary judgment on Count VI and Count X arguing

that Ellison had probable cause for the arrest.   [DE 49-1 at 471–72, 474].   The City contends that

because the claims against it are derivative, Harrison cannot recover against it on a theory of

*respondeat superior*.   [DE 51-1 at 505].   Harrison contends that Count VI and Count X cannot be

dismissed because Ellison did not have probable cause for the arrest.   [DE 66 at 930].

For a plaintiff to succeed on a claim for false arrest or false imprisonment, she must prove

that the officer lacked probable cause for the arrest.   *Frodge v. City of Newport*, 501 F. App'x 519,

526 (6th Cir. 2012).   Likewise, the Supreme Count of Kentucky has held that a plaintiff must

demonstrate the following to prevail on an action for malicious prosecution:

1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;

2) the defendant acted *without probable cause*;

3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;

4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and

5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016) (emphasis added).

The Court held, *supra* Section V.A., that Ellison had probable cause to arrest Harrison. Because probable cause existed, Harrison's claims for false arrest or false imprisonment must fail. *See Frodge*, 501 F. App'x at 526.  Harrison is also precluded from proving an essential element of her claim for malicious prosecution.  *See Martin*, 507 S.W.3d at 11–12.  Accordingly, Ellison's Motion for Summary Judgment [DE 49-1] and the City's Motion for Summary Judgment [DE 51-1] are **GRANTED** as to Count VI and Count X.

## X.    NEGLIGENCE, GROSS NEGLIGENCE, AND NEGLIGENCE PER SE (COUNT VII)

In Count VII, Harrison alleges that Ellison "owed duties to [Harrison] to conduct himself as a reasonable person in his interaction with her, and not to inflict injury upon her." [DE 1 at 7]. Ellison moves for summary judgment on Count VII because it is incompatible with the intentional tort of assault and battery.  [DE 49-1 at 477].  In response, Harrison contends that there is evidence an injury could have been inflicted by Ellison's negligence.  [DE 66 at 932].  Harrison also alleges that she is also asserting a claim that Ellison was negligent "in the investigation, pursuit, and detention" of Harrison that led to injury.  [*Id.*].

Courts have held that a "negligence claim premised on a police officer's alleged excessive force is not cognizable."  *Crowe v. Steward*, No. 5:20-CV-203-REW, 2022 WL 4291331, at *8 n.10 (E.D. Ky. Sept. 16, 2022).  An "officer is liable for the intentional tort of battery, not for negligence, when he deliberately exceeds the privileged amount of force by committing an unwarranted violence on the arrestee."  *Ali*, 2006 WL 2663018, at *8 ("To permit a separate claim for negligence creates the risk that a jury would assume that, even if no excessive force were used, the officer might somehow still be liable for some undefined negligence.").  Here, Harrison has asserted a negligence claim premised on Ellison's alleged excessive use of force.  [DE 1 at 7].

Accordingly, the Court cannot allow Harrison's negligence claim based on Ellison's use of force to proceed. *See Crowe*, 2022 WL 4291331, at *8 n.10.

Regarding Harrison's second negligence claim, Defendants are entitled to "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Once a case has progressed to the summary judgment stage, the liberal pleading standards available at the motion to dismiss phase are no longer available. *See Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787–88 (6th Cir. 2005). If a plaintiff does decide to advance a new legal theory after discovery has concluded, then the correct course is to amend the complaint under Federal Rule of Civil Procedure 15(a). *See id.* at 788. "[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (quoting *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)).

Harrison's complaint strictly bases her negligence claims on Ellison's use of force. [DE 1 at 7]. She did not allege a negligence claim based on Ellison "investigation, pursuit, and detention" until her response to his motion for summary judgment. [DE 66 at 932]. Ellison and the City are entitled to fair notice of the claims against them. *See Twombly*, 550 U.S. at 555. Harrison is prohibited from asserting this new claim for the first time in response to Ellison's motion. *Desparois*, 455 F. App'x at 666. Therefore, any claim based on Ellison's negligence in his investigation, pursuit, and detention of Harrison must be dismissed. *Id.* Ellison's Motion for Summary Judgment [DE 49-1] and the City's Motion for Summary Judgment [DE 51-1] are **GRANTED** as to Count VII.

XI.     **CONCLUSION**

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1.      Defendants' Motion to Exclude Gilbertson [DE 52] is **GRANTED IN PART** and **DENIED IN PART** as discussed above;

2.      Harrison's Motion to Exclude Cox [DE 54] is **GRANTED IN PART** and **DENIED IN PART** as discussed above;

3.      Hockenbury is **DISMISSED** from this case;

4.      Ellison's Motion for Summary Judgment [DE 49-1] and the City's Motion for Summary Judgment [DE 51-1] are **GRANTED IN PART** as to Counts I, VI, VII, and X and **DENIED IN PART** as to Counts II, III, IV, V, VIII, and IX; and

5.      Harrison's Motion for Partial Summary Judgment [DE 53] is **DENIED.**

Rebecca Grady Jennings, District Judge

United States District Court

June 22, 2023

42